AARON A. KLEINMAN AND OLIVIA KLEINMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kleinman v. Commissioner
Docket No. 23060-91
United States Tax Court
T.C. Memo 1994-19; 1994 Tax Ct. Memo LEXIS 23; 67 T.C.M. (CCH) 1973; January 18, 1994, Filed *23 Decision will be entered under Rule 155. For petitioners: Bruce I. Hochman and Dennis L. Perez. For respondent: Robin F. Kaufer and Carol C. Mason. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined a deficiency in petitioners' 1979 Federal income tax in the amount of $ 1,164,556 and an addition to tax pursuant to section 6653(b) in the amount of $ 582,278. After concessions, the issues for decision are: (1) Whether petitioner Aaron A. Kleinman (Mr. Kleinman) received unreported income of $ 1,225,448 for tax year 1979. We hold that he received unreported income of $ 996,448 for tax year 1979. (2) Whether petitioners are liable for an addition to tax pursuant to section 6653(b). We hold that they are. (3) Whether petitioner Olivia Kleinman (Mrs. Kleinman) is entitled to relief from liability for taxes, interest, and additions to tax for taxable year 1979 as an "innocent spouse" pursuant to section 6013(e). We hold that she is not. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the tax year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS *24 OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Aaron A. Kleinman and Olivia Kleinman, husband and wife, filed a joint Federal income tax return for 1979. At the time the petition was filed, petitioners resided in Downey, California. Mr. Kleinman attended Los Angeles City College, University of California at Los Angeles, and Fairleigh Dickinson, with a major in English. He also took accounting courses at UCLA Extension. He has worked for several accounting firms, and has prepared hundreds of Federal income tax returns for individuals and businesses, both prior to and including the year at issue. He is not a certified public accountant, although he has falsely held himself out to be one. He was a registered financial adviser from 1976 through 1979. Mrs. Kleinman received an A.A. degree from Los Angeles City College, with a major in air transportation. In 1969, Mr. Kleinman started a financial services business offering accounting, bookkeeping, tax, and investment advice. This business was later incorporated under the name Manus, Inc. (Manus). All the stock *25 of Manus was owned jointly by Mr. and Mrs. Kleinman. During the 1970s (and including 1978), Mr. Kleinman reported on his Federal income tax returns a salary from Manus of approximately $ 3,000 per month. However, during 1978, Mr. and Mrs. Kleinman both signed a residential loan application, under penalty of the provisions of 18 U.S.C. section 1014, stating that they had a gross monthly income of $ 34,600. Through Manus, Mr. Kleinman set up an illegal "Ponzi scheme", whereby he would promote a series of investments, using the proceeds from each promotion to pay off the alleged returns from the prior promotions, keeping the excess funds for himself. This scheme ultimately collapsed. In addition, Mr. Kleinman was involved in a check-kiting scheme from March 1979 through August 1979. During this time, he maintained approximately 21 individual and joint bank accounts and 10 Manus corporate accounts. Mrs. Kleinman's name appeared on 17 of petitioners' 21 bank, loan, and brokerage accounts, and 17 of these 21 accounts had mailing addresses of petitioners' residence. Under the check-kiting scheme, Mr. Kleinman would write checks when he did not *26 have the money to cover the checks. The banks would give him credit as of the time of making the deposit, rather than when the funds were actually paid, thus giving him free use of the money. He involved Mrs. Kleinman in his scheme. On one occasion, he instructed his wife to sign a $ 100,000 check on one of their joint accounts to Manus, and he reimbursed the account with a check from Manus on the next day. Mrs. Kleinman also signed four checks on two brokerage accounts held in joint tenancy in 1979, including one check for $ 50,000. During August 1979, the Securities and Exchange Commission (SEC) filed a complaint for injunction and for the appointment of a receiver for Manus. As a result, Irving Sulmeyer was appointed receiver for Manus. In September 1979, an indictment was filed against Mr. Kleinman in the U.S. District Court for the Central District of California charging him with 23 counts of violations of Federal law, including securities fraud, mail fraud, investment fraud, and fraud by an investment adviser. On March 12, 1980, Mr. Kleinman pled guilty to four counts of the indictment. He concedes that he was also guilty of two additional counts of the indictment. *27 On May 5, 1980, Mr. Kleinman was sentenced to 5 years in prison for securities fraud and mail fraud. He was incarcerated in Lompoc, California, from May 22, 1980, through April 10, 1983, at which time he was released to a halfway house, where he served 3 more months. After the SEC closed the Manus offices in August or September 1979, Mr. Kleinman worked at six different jobs from September 1979 to the date of his incarceration in May 1980. During 1979, Mr. Kleinman opened a bank account in the name of his wife's sister, Lupe Valdez. Mr. Kleinman deposited $ 79,000 into the bank account under Lupe Valdez' name. Of this, $ 20,579 was taken from an E.F. Hutton securities account Mr. Kleinman had maintained. Ultimately, $ 34,215 was withdrawn from this account to pay Irving Sulmeyer, the receiver of Manus. Until September 1979, petitioners held title to their residence as joint tenants. In September 1979, Mrs. Kleinman tendered a check for $ 3 to the Los Angeles County Recorder, in order to change title to petitioners' residence to Mrs. Kleinman as sole owner. Petitioners transferred their joint interests in their residence to Mrs. Kleinman in order to protect such residence *28 from seizure by creditors. On September 5, 1979, Mr. and Mrs. Kleinman filed a "Declaration of Homestead (Joint Declaration of Husband and Wife)" declaring petitioners' residence as their homestead. On October 26, 1979, Mrs. Kleinman filed a "Declaration of Homestead (By a Single Person not the Head of a Family)" declaring petitioners' residence as her homestead and denying any previous declaration of homestead. During October 1979, petitioners purchased an automobile for $ 8,000, consisting of a $ 4,000 downpayment and a loan for $ 4,000, for the sole use of Mrs. Kleinman, but with title and insurance held in the name of Lupe Valdez. Mr. Kleinman's settlement with the SEC required him to pay an amount equal to the equity in the Hasty Avenue residence, less the homestead exemption, to the Manus receiver. This was done through a promissory note, secured by a deed of trust on the property signed by Mrs. Kleinman, the then sole record owner of the property, in the amount of $ 59,300. Mrs. Kleinman used her separate property to pay the debts of Mr. Kleinman on at least one other occasion. Mr. Sulmeyer retained William Russ to take control of the Manus records and make them available *29 to all interested parties. Mr. Russ also analyzed some of Mr. and Mrs. Kleinman's bank accounts to determine the flow of funds from various Manus investment activities. Mr. Russ admits, however, that there were additional bank accounts which he had not examined. Petitioners' 1979 Federal income tax return was signed on April 14, 1980, and filed on April 15, 1980. Mrs. Kleinman knew that Mr. Kleinman was indicted for investment fraud, and had pled guilty to such charges, prior to signing their 1979 Federal income tax return. On their 1979 Federal income tax return, petitioners reported $ 40,192 in total income. During 1979, petitioners had $ 10,435 in various withholdings from their wage income, for a total take-home income of $ 29,758. Petitioners did not receive any gifts, inheritances, legacies, or devises during 1979. Petitioners concede that they failed to report dividend income earned during 1979. Petitioners also concede that they failed to attach a Schedule E or to report any rental income from their Newport Beach condominium that they rented out during 1979 on their 1979 Federal income tax return. During 1979, petitioners made deposits of over $ 4 million into their *30 personal bank, loan, and brokerage accounts. In the statutory notice of deficiency, petitioners were given credit for $ 1,886,978 in returns to the corporation and $ 802,571 in nontaxable deposits. During the course of preparation for trial, petitioners were given credit for an additional $ 463,757 in returns to the corporation and nontaxable deposits, leaving petitioners with approximately $ 1,225,448 in deposits to rebut. OPINION Issue 1. Mr. Kleinman Received Unreported Income of $ 996,448 for Tax Year 1979
Petitioners assert that respondent's deficiency notice is not entitled to the usual presumption of correctness because it is arbitrary and erroneous. Specifically, petitioners assert that Mr. Kleinman did not receive unreported income in the amount of $ 1,225,448 during tax year 1979. As a general rule, the Commissioner's deficiency determination is presumptively correct, and the taxpayer bears the burden of coming forward with sufficient evidence to overcome the presumption. Welch v. Helvering, 290 U.S. 111 (1933); Erickson v. Commissioner, 937 F.2d 1548, 1551 (10th Cir. 1991), affg. T.C. Memo. 1989-552. *31 But such presumption of correctness is only as strong as its rational underpinnings. Where it lacks a rational basis the presumption evaporates. Otherwise the Commissioner could, merely by arbitrarily issuing a naked assessment, place upon the taxpayer the unfair, and at time [sic] impossible, burden of proving a negative, that he did not receive the illegal income assessed against him.
Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), affg. in part and revg. and remanding in part 74 T.C. 260 (1980). Thus, where there is alleged unreported income from illegal activities, courts have required the Commissioner to offer some substantive evidence connecting the taxpayer to the alleged illegal income-producing activity before according the Commissioner's determination a presumption of correctness. Erickson v. Commissioner, supra; Llorente v. Commissioner, supra; Weimerskirch v. Commissioner, 596 F.2d 358, 360-361 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Once the Commissioner *32 demonstrates that the taxpayer possessed liquid assets or expended funds or made substantial cash deposits in a bank, the presumption of correctness generally afforded to the Commissioner's determination remains. Erickson v. Commissioner, supra at 1551-1552; Delaney v. Commissioner, 743 F.2d 670 (9th Cir. 1984), affg. T.C. Memo. 1982-666; Schad v. Commissioner, 87 T.C. 609, 618-620 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987); Tokarski v. Commissioner, 87 T.C. 74, 76 (1986). In such situations, the taxpayer is deemed connected to the assets, not the income-producing activity. Erickson v. Commissioner, supra.
Section 6001 requires taxpayers to maintain adequate records from which their correct tax liability may be determined. Erickson v. Commissioner, supra at 1552; Petzoldt v. Commissioner, 92 T.C. 661, 686 (1989). Where a taxpayer fails to maintain the required records, section *33 446 authorizes the Commissioner to reconstruct income in accordance with a method which clearly reflects the full amount of the income received. Petzoldt v. Commissioner, supra at 687. The reasonableness of the reconstruction is considered in light of the surrounding facts and circumstances. Id.
The reconstruction of income method used here is similar to that used in Erickson v. Commissioner, supra. We therein upheld the Commissioner's income reconstruction determination, and the Court of Appeals for the Tenth Circuit, in affirming our decision, noted that the taxpayer kept inadequate or no records and that the sources of the funds expended were "matters peculiarly within * * * [the taxpayer's] knowledge". Id. at 1554. Once the Commissioner has linked the taxpayer to an income-producing activity, the burden of proving that the Commissioner's determination is erroneous, arbitrary, or otherwise invalid rests on the taxpayer. Resyn Corp. v. United States, 851 F.2d 660, 663 (3d Cir. 1988); Adamson v. Commissioner, 745 F.2d 541 (9th Cir. 1984), *34 affg. T.C. Memo. 1982-371; Edwards v. Commissioner, 680 F.2d 1268 (9th Cir. 1982), affg. T.C. Memo. 1982-371. Petitioners have not met this burden. In the instant case, through Manus, petitioners obtained funds from clients, which funds were supposed to be invested in different types of property, namely real estate, stocks, and Bureau of Indian Affairs bonds. In most cases, the property that was to be purchased with client moneys was never purchased. Instead, the funds obtained were deposited in petitioners' 21 personal bank and brokerage accounts and the 10 corporate accounts belonging to Manus. Mr. Kleinman pled guilty to four counts of an indictment, each of which contained elements of fraud, in relation to his activities with Manus. According to the terms of the indictment, the truth of which was admitted by Mr. Kleinman in testimony, approximately $ 2,149,000 in client funds was paid into petitioners' bank and brokerage accounts and Manus accounts. These facts support respondent's determination charging petitioners with additional income. The unreported income in this case stems from *35 the taking of investor money for purported acquisition of an asset that was never purchased. Respondent has shown over $ 4 million of deposits going into petitioners' 21 personal bank accounts. Such deposits have been linked with the activities of Manus. These large deposit amounts and the 21 bank and brokerage accounts maintained by petitioners are suspicious on their face since petitioners reported only $ 40,192 of total income on their 1979 Federal income tax return, and received no gifts, inheritances, legacies, or devises during the year. Respondent eliminated $ 2,689,549 from the unreported income computation as nontaxable amounts, leaving petitioners with a balance of $ 1,225,448. [1]
Petitioners argue that the reason for their large deposits was check kiting. Respondent, however, has already taken *36 such activities into account in making its determination. If petitioners wished to argue that certain further items in respondent's bank deposit analysis were incorrect, these arguments could have been brought up at any time, and indeed should have been brought up during the trial of this case. See United States v. Stein, 437 F.2d 775, 778 (7th Cir. 1971). General testimony regarding check kiting is not sufficient to meet petitioners' burden. Estate of Mason v Commissioner, 64 T.C. 651, 655-656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Petitioners called William Russ as a witness. Mr. Russ worked as an accountant for the receiver of Manus, Irving Sulmeyer. Mr. Russ testified that he recalled reviewing 16 bank and brokerage accounts of petitioners and Manus, although "there could be more". However, this case encompasses 31 bank, loan, and brokerage accounts. We cannot help but notice that petitioners have failed to enter bank records or other documentation into the record. The fact that petitioners did not choose to introduce primary evidence of transactions indicates that such records *37 would not support their arguments. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In analyzing a bank deposits case, deposits will be considered income when there is no evidence that they represent anything other than income. United States v. Doyle, 234 F.2d 788, 793 (7th Cir. 1956). In the instant case, respondent made a diligent attempt to follow all leads in order to trace nontaxable items, as evidenced by the large amounts of nontaxable deposits and returns to the corporation, Manus, which were eliminated from respondent's income analysis. No more is required on respondent's part. Holland v. United States, 348 U.S. 121 (1954); United States v. Stein, 437 F.2d 775 (7th Cir. 1971). Upon performing our analysis of petitioners' bank deposits, we find that an additional $ 229,000 should be eliminated from the reconstructed amount of petitioners' 1979 income, leaving petitioners with unreported income for 1979 s11979 of $ 996,448. There are three reasons for this. *38 First, petitioners deposited a $ 97,000 check on July 23, 1979, which was never paid because of insufficient funds. Respondent included this deposit into petitioners' income. Respondent erroneously added an additional $ 97,000 as a deposit on August 1, 1979, which, in reality, was a reversal of the earlier deposit. When respondent subsequently credited the account, respondent credited the account only once for $ 97,000, whereas respondent should have credited it twice. Thus, $ 97,000 should be subtracted from petitioners' reconstructed income. Second, loan proceeds from Bank of America loan 109-738 for $ 100,000 were used to purchase a certificate of deposit for $ 100,000. Although respondent acknowledges that the $ 100,000 used to purchase the certificate of deposit is nontaxable, respondent included the repayment of the loan as a taxable deposit. In reality, the $ 100,000 certificate of deposit was used to repay the loan. Hence, the repayment of the loan came from a nontaxable source; accordingly, an additional $ 100,000 should be subtracted from petitioners' reconstructed income. Third, a deposit of $ 32,000 came from petitioners' Lloyd's Bank Account, number XXXX-X0597. *39 Respondent included this as a deposit, whereas in reality the deposit came from a nontaxable source. To summarize, we find that respondent's determination of petitioners' taxable deposits should be reduced by a total of $ 229,000, resulting in unreported income of $ 996,448 for 1979. Other than this $ 229,000, which we have now eliminated from income, petitioners have shown no reason as to why respondent's determination is incorrect. We are not bound to accept, and do not accept, petitioners' self-serving testimony. Therefore, we hold that petitioners have not met their burden of proof, except as to the $ 229,000 which we have eliminated from income. Issue 2. Petitioners Are Liable for an Addition to Tax Pursuant to Section 6653(b)
Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Section 6653(b) provides an addition to tax equal to 50 percent of the underpayment if any part of the underpayment is due to fraud. An underpayment of tax is due to fraud if it results from a taxpayer's specific intent to evade a tax which the taxpayer believes that he owes. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), *40 affg. T.C. Memo. 1984-601. Thus, in order to prove that an underpayment is due to fraud, the Commissioner must show that the taxpayer intended to evade a tax known to be due by engaging in conduct designed to conceal, mislead, or otherwise prevent the collection of such tax by the Commissioner. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). The existence of fraudulent intent is a factual question to be decided on the basis of an examination of the entire record. Recklitis v. Commissioner, supra at 909; Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). It may never be presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because direct proof of a taxpayer's intent is rarely available, however, fraud may be established by circumstantial evidence. Grosshandler v. Commissioner, supra at 19; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), *41 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). A taxpayer's business experience and knowledge of tax laws may tend to prove or disprove the existence of fraud. Afshar v. Commissioner, T.C. Memo. 1981-241, affd. without published opinion 692 F.2d 751 (4th Cir. 1982). In the present case, Mr. Kleinman is experienced in the area of Federal income tax, having prepared hundreds of returns, and having set up Manus, one of the principal purposes of which was to prepare Federal income tax returns. Mr. Kleinman estimated that Manus prepared over 500 Federal income tax returns each year. Mr. Kleinman has taken accounting courses through UCLA Extension and has worked for accounting firms. He was a certified financial adviser during the year at issue, held himself out to be a certified public accountant (although he was not one), and, because of his financial savvy and perceived accounting expertise, was able to induce a large number of people to invest over $ 2 million in various financial schemes. Mr. Kleinman's strong financial background indicates to us that he was acting with full *42 and complete knowledge when he filled out and filed petitioners' 1979 Federal income tax return. In making our determination as to whether the fraud penalty is appropriate, we may consider evidence of fraudulent conduct in other business transactions, which may be considered along with other evidence in determining the intent of the taxpayer. Toledano v. Commissioner, 362 F.2d 243, 247 (5th Cir. 1966), affg. in part and revg. in part T.C. Memo. 1963-200; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). A taxpayer's dishonesty in business dealings or willingness to defraud others may indicate a willingness to defraud the Commissioner. Sullivan v. Commissioner, T.C. Memo. 1989-30, affd. without published opinion 904 F.2d 696 (3d Cir. 1990); Afshar v. Commissioner, supra.
During 1979, Mr. Kleinman was indicted on 23 Federal charges involving elements of fraud. In March 1980, he pled guilty to counts 3, 6, 16, and 18 of that indictment. He *43 has conceded that he was also guilty of counts 1 and 2 of the indictment. The charges to which he pled guilty all contained elements of fraud. Counts 16 and 18 refer to specific fraudulent acts committed during 1979, the year at issue. The essence of the indictment was that Mr. Kleinman solicited investment money from clients for purported investments that he promised to make in different sorts of property. Such property, for the most part, was never purchased. The indictment, with regard to almost every count, including those pled guilty to, states the following: Defendant Mr. Kleinman intentionally devised and carried out a scheme to defraud clients and creditors of Manus, Inc., other members of the public and the Internal Revenue Service ("IRS") and to obtain money and property by means of false and fraudulent representations, pretenses and promises * * * Illegal acts committed by a taxpayer are an indicium of fraud. Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Mrs. Kleinman stated in testimony that she could not remember whether she had read her husband's indictment. *44 We find her testimony incredible. She had been married to her husband for 20 years, and his indictment would undoubtedly affect her life both personally and financially in a significant way. Mr. Kleinman pled guilty to four of the charges in the indictment on March 3, 1980, 6 weeks prior to the filing of petitioners' 1979 Federal income tax return. Consequently, we believe Mrs. Kleinman was aware of her husband's fraudulent activities at the time of filing their 1979 Federal income tax return. Petitioners' adjusted gross income for 1979 was $ 40,192. After withholding of all taxes, petitioners' actual take-home pay for 1979 was $ 29,758. At this same time, Mrs. Kleinman was a named owner on 17 personal bank accounts. On one of these accounts, she wrote checks totaling $ 109,000 during 1979. On two of her brokerage accounts held in joint tenancy, she signed five checks totaling $ 74,097 during the year. Thus, Mrs. Kleinman was an active participant in her husband's schemes. Despite her protestations to the contrary, Mrs. Kleinman has shown herself to be a financially savvy person who will take the actions necessary to conserve her and her husband's property. This has been *45 shown when Mrs. Kleinman wrote a check for $ 3 to the Los Angeles County Recorder in October 1979, the year in question, in order to change the names on the title of petitioners' Hasty Avenue property from that of Mr. and Mrs. Kleinman to that of Mrs. Kleinman alone. Such action must be seen as an attempt to protect the Kleinmans' house from creditors such as the IRS as well as the SEC, which had indicted Mr. Kleinman in September 1979, 1 month earlier. Petitioners have a pattern of underreporting income, including substantial underreporting of income for 1979. Petitioners have not provided us with complete records, have attempted to conceal assets, and have a history of fraudulent activities. The totality of these factors serves as a clear indication that petitioners' underpayment of tax is due to fraud with the intent to evade tax. Thus, we conclude that petitioners' underpayment of tax was due to fraud with the intent to evade tax. We therefore sustain respondent's determination of the addition to tax for fraud under section 6653(b) for 1979. Issue 3. Mrs. Kleinman Is Not an Innocent Spouse as Defined in Section 6013(e)
As a general rule, where a husband and wife *46 file a joint tax return, the appropriate tax is computed with respect to their aggregate income and the resulting tax liability is joint and several. Sec. 6013(d)(3). Petitioners, however, argue that Mrs. Kleinman should be relieved of her tax liability for the year at issue since she was an innocent spouse within the meaning of section 6013(e). In order to qualify Mrs. Kleinman for relief as an innocent spouse, petitioners must establish: (A) A joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement. Sec. 6013(e). Petitioners bear the burden of proving each requirement of section 6013(e). Rule 142(a); Russo v. Commissioner, 98 T.C. 28, 31-32 (1992). Failure *47 to prove any one of the requirements will preclude the spouse from relief. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989). We are not persuaded that Mrs. Kleinman meets the requirement of section 6013(e)(1)(C). Section 6013(e)(1)(C) provides that "the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement". In determining whether Mrs. Kleinman knew, or had reason to know, of the substantial understatement, we consider all of the facts and circumstances. Hayman v. Commissioner, 992 F.2d 1256 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Estate of Krock v. Commissioner, supra at 677. Mr. Kleinman was indicted on 23 counts of Federal crimes during September 1979, and pled guilty *48 to 4 of those counts in March 1980. The indictment, and specifically the counts to which Mr. Kleinman pled guilty, clearly states again and again that Mr. Kleinman took client moneys for his personal benefit and that of his family. Moreover, counts 16 and 18, to which Mr. Kleinman pled guilty, are for specific instances of investment fraud which took place in 1979. The indictment further states the approximate amounts which were taken by Mr. Kleinman. Since petitioners' Federal income tax return was not signed until April 14, 1980, Mrs. Kleinman had reason to be well aware that her husband had committed some serious crimes, and in the course thereof, had taken substantial money from clients. In other cases where spouses have been indicted for crimes involving the taking of money, the courts have pointed to the date of the indictment as being of importance in determining whether someone may be found to be an innocent spouse. Where the indictment takes place before the filing of the income tax return, the courts have often found that innocent spouse status is inappropriate. Krause v. Commissioner, T.C. Memo. 1991-13; Newton v. Commissioner, T.C. Memo. 1990-606; *49 Robinson v. Commissioner, T.C. Memo. 1990-235. Section 1.6013-5(b), Income Tax Regs., states that transfers of property may constitute evidence of a direct or indirect benefit. In a previous case, we have held that coownership of bank deposits and other property represented a disqualifying benefit to the taxpayer seeking innocent spouse treatment. Purificato v. Commissioner, T.C. Memo. 1992-580, affd. 9 F.3d 290 (3d Cir. 1993). In the instant case, Mr. Kleinman clearly had the dominant voice in the Kleinmans' family and business affairs. Nonetheless, Mrs. Kleinman benefited both directly and indirectly (beyond normal support) from the unreported income here in issue. Not only was Mrs. Kleinman accorded ownership, whether individually or jointly, of substantial assets, but she reaped the more general benefits that arose from the increasing prosperity of the Kleinmans. Moreover, to hold otherwise conceivably could make it possible for the Kleinmans to shelter present and future assets from collection by respondent through holding those assets in Mrs. Kleinman's name. Given all of the facts *50 and circumstances before us, we believe that Mrs. Kleinman experienced significant benefits, of both a direct and indirect nature and knew and had reason to know of the substantial understatement of income on petitioners' 1979 Federal income tax return, and that it is not inequitable to hold her liable for the unreported income attributable to Mr. Kleinman's activities. Accordingly, we hold that Mrs. Kleinman is not entitled to innocent spouse relief under section 6013(e) for the taxable year at issue. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. This amount consists of $ 1,689,205 in additional income as stated in the statutory notice, less $ 463,757 in credits given to petitioners for nontaxable items proven during the course of trial preparation.↩