The **UNITED STATES** of America,
Plaintiff-Appellee,

v.

John J. **DOYLE**, Defendant-Appellant.

No. 11528.

United States Court of Appeals Seventh Circuit.

May 23, 1956.

Rehearing Denied Aug. 6, 1956.

John H. O'Hara, Indianapolis, Ind., Maurice J. Walsh, Chicago, Ill., for appellant.

Jack C. Brown, U. S. Atty., Indianapolis, Ind., Charles K. Rice, H. Brian Holland, Asst. Attys. Gen., for appellee.

Before FINNEGAN, LINDLEY and SCHNACKENBERG, Circuit Judges.

LINDLEY, Circuit Judge.

On August 30, 1954, a grand jury returned an indictment against defendant in two counts, the first of which charged defendant with having willfully attempted to defeat and evade a large part of income tax due and owing by him and his wife for the year 1947 by filing a joint return for that year showing a tax liability of $38,770.01, whereas, it was averred, the defendant knew that the amount due was $59,812.73, more or less, all in violation of the Internal Revenue Code, Title 26, U.S.C. § 145(b), and the second of which charged the same offense for the year 1948, alleging that, whereas the tax return showed due $58,317.24, defendant knew that the true amount was $76,410.86, more or less. After a trial extending from January 11 to January 29, 1955, the jury returned a verdict of guilty upon each count, and defendant was sentenced to a term of 2 years and fined $10,000 on the first count, and to a term of 2 years on the second count, to be served concurrently with the sentence on Count I.

On appeal defendant asserts some 18 contested issues, which, in its brief, he argues under contentions as follows: (1) that the use of the bank deposit analysis employed by the Government in reconstructing defendant's income was erroneous; (2) that the evidence was insufficient to warrant conviction, since no likely source of defendant's increase under

the net worth theory was shown; (3) that the proof did not establish a firm starting point at the close of 1946 or at any other time; (4) that the Government failed to negative all possibilities that the cash included in its estimates had a source other than as taxable income; (5) that exhibits 103 and 108, summaries prepared by the Government accountant, were erroneously admitted in evidence; (6) that defendant was prejudiced by the refusal of a bill of particulars; and (7) that the court erred in refusing certain instructions and in over-ruling objections to certain others submitted to the jury. In the brief, certain of these contentions are merged in argument with others.

The facts most favorable to the Government, which the jury by its verdict must have interpreted in favor of the Government, are somewhat complicated, but are essentially as follows: Defendant has lived in Gary, Indiana, since 1936. There, at first, he continued his former occupation of handling concessions such as games of chance at picnics and other public gatherings, for some five years, during which time he was convicted of gambling. In 1943 he started in a small way to make books on horse races. As he himself stated, he had nothing in the way of capital "to speak of" prior to 1945. He had no tax liability prior to 1941, an income of $3100 in 1941, $2350 in 1942, $7500 in 1943, and $7522 in 1944. In 1944, one Ellis became a partner in this business. In 1943, defendant purchased Series "E" bonds in the amount of $75.00, and in 1944 in the amount of $125.00. His savings account at the Gary National Bank in 1944 showed total deposits in 1944 of $500. He had a safety deposit box at the bank from and after April, 1944. On December 31, 1944, he had a net worth of approximately $1,000.

On August 1, 1945, with certain other persons, he formed the Calumet News partnership, the members of which varied from time to time. In 1945 he placed 8 or 10 coin machines, and during the year purchased two $50 bonds, six

$500 bonds and two $1,000 bonds, and opened a checking account at Gary National Bank, with some $2600. During the year he gave to Virginia Heckler, a relative, some $1500. He reported in his income tax return a net income of $53,184.72, derived from the two partnerships, and paid a tax of $6,826.78.

January 1, 1946, defendant organized a novelty company partnership with one Crawford as partner. At the same time the News Service was reorganized. During the year he purchased a 1946 Lincoln automobile for $2694.98, loaned Robinson $3000, and made gifts to Virginia Heckler of $5,500. In June of that year, his wife, Frances, leased a safety deposit box at the Gary National Bank. His equity in the three partnerships as of December 31, 1946, aggregated $8,708.-37, which represented an increase in his partnership holdings occurring during the years 1945 and 1946. On December 31, 1946 the balance in his checking account at the Gary National Bank was $34,872.54, and that in the savings account $1,516.79. For 1946 defendant reported net income of $110,963.49 from the three activities, the 442 Club, the Novelty Company and the News Company. He paid in that year $54,539.08 on his income taxes for the years 1945 and 1946. The Government contended, and substantial evidence tended to show, that his total net worth on December 31, 1946, was $79,590.68.

All of defendant's receipts were in currency. The three partnerships maintained no banking accounts. His receipts, in cash, from slot machines and racing books, in currency, were placed in his safe, but from time to time he took money thence to a joint deposit box to which he and one Crawford had access. The receipts from all the co-partnerships were mixed indiscriminately in the safety deposit box, from which he removed currency from time to time, making deposits in his checking accounts as he needed funds. Crawford's share of the novelty company receipts in 1947 was over $26,000, and in 1948, over $60,-000. The slot machines increased from

16 in January to 42 in December, 1947, and, in 1948, from 42 in January to 85 in December.

From January 1, 1947 through June 14, of the same year, the race booking business was conducted through 14 sub-stations, at each of which an employee kept a record of payoffs and divided the profits in pursuance of an agreement with Doyle's company on a 60-40, or 50-50 percentage basis. The business reported a net income of $122,199.05 in 1947. During the 7 months of its operation in 1948 it showed a total of so-called "ins" of $1,248,000. The News Company paid that year a gross income tax of $1,924.

The Government obtained its basic information from many exhibits offered in evidence, including certain summaries made by authorized employees of Doyle. However, the employees never examined any of the underlying records on which the summaries given them were based, merely transcribing the figures in the records in evidence.

Doyle testified that in the years in question his means of livelihood were derived from these three undertakings and that neither he nor his wife or sons had received any gifts or inheritances. He opened a second checking account at the Gary Trust & Savings Bank on November 18, 1947 with a deposit of $18,500.

It was contended, and the evidence justifies the conclusion, that all the records were Doyle's, that he signed the partnership returns and that he turned the documents over to Schreiber, the auditor for the Government. The underlying original records were destroyed by burning, before the indictment was returned; only the summary information was preserved and later delivered to the Government auditor. Schreiber interviewed Doyle on April 25, 1951. Defendant was advised of his constitutional rights and asked to bring in all books and records, including cancelled checks and bank statements. He complied on April 26, 1951, and advised the Government agents they might keep them as long as they desired. When the auditors

commented that the records appeared to be nothing but summaries, he informed them that the underlying documents had been destroyed prior to the investigation.

Schreiber asked Doyle for a net worth statement on at least six occasions, and at different times, in September and October, 1951, told him that he, Schreiber, would furnish the Government accounting figures to defendant if defendant would disclose his. Doyle declined to do so. In July, 1952, Schreiber again requested of defendant a year to year net worth statement and a statement concerning his tax liability. Defendant did not object to giving Schreiber an itemized oral statement of living expenses, but said he did not know how much cash he had in the safety deposit boxes at any one time.

Schreiber continued his investigation, analyzed each bank and savings deposit, made an analysis of the cancelled checks, compared them with the debits on the bank ledgers, made a detailed examination of each and every entry in the summaries, compared those records with the tax returns, checked returns with Doyle's so-called partners, canvassed the department stores in Gary, East Chicago and Chicago areas for charge accounts, checked all public records for real estate transactions, mortgages and acquisitions, inventoried the safety deposit boxes, made an examination of Doyle's tax liabilities and of the Jackson Restaurant records, made a detailed check of each and every transaction affecting defendant's financial affairs, and checked with Doyle all financial transactions which came to light during the course of the investigation.

In addition to his other activities, Doyle had an interest in Jackson's Restaurant, with one Paul Jackson, entering into a partnership with him on May 27, 1947, which operated as a night club. The partnership agreement was executed by one O'Donnell and one Jackson. Jackson put in $20,000 and claimed he did not know where O'Donnell got the other $20,000. In 1947, the restaurant had

gross receipts of $68,930, and a net income of $2900, 50% of which was given to O'Donnell. In 1948 Doyle and Jackson contracted for air-conditioning. Doyle gave his personal check for $1,000, and made subsequent payments of $2,000. The property was finally fully paid for in 1948 and conveyed to Doyle and Jackson and their wives. In October, 1948, Doyle suggested to O'Donnell that he take over the latter's interest; O'Donnell complied. Doyle says that the consideration for this was his payment of O'Donnell's income tax of $1659 for 1948. The partnership was succeeded by a corporation with 20 shares of stock, 9 of which went to Doyle, 1 to Mrs. Doyle, 1 to Mrs. Jackson, leaving 9 in Jackson's name. Various other details as to the conduct of the night club were received in evidence, which we deem it unnecessary to discuss.

The foregoing does not include discussion of all of the evidence, oral and documentary, submitted in a somewhat lengthy trial, but it is sufficient, we think, to supply an adequate view of the facts pertinent to the issues presented.

■■■ Exhibit 103 was a summary prepared by the Government auditors from the records, bank accounts, savings accounts, and Doyle's own statements. As a result, after showing all deposits in the Gary National Bank checking account and two savings accounts, and in the Gary Trust & Savings Bank checking account and one savings account, the total bank deposits for the year, making all deductions called for by Doyle, the auditor found a net income for the year 1947, of $97,503.30, resulting in an additional net income over that reported of $27,032.28. For 1948, the auditor found a net income of $150,032.17. The reported net income having been $119,300.-05, there resulted an additional net income of $30,732.12.

Defendant complains that the exhibit should not have been received. But the existence of unreported income may be proved by any practical method available in the circumstances of the particu-

lar situation. Davis v. United States, 6 Cir., 226 F.2d 331, 336, certiorari denied 350 U.S. 965, 76 S.Ct. 432. The Government is free to use all proper evidence available. Holland v. United States, 348 U.S. 121, at page 132, 75 S.Ct. 127, 99 L.Ed. 150. Of course, proof under the bank deposit theory is circumstantial in nature, but we know of no reason why such deposits may not be considered in determining income, when there is no evidence that they represent anything other than income. In other words, such evidence will support an inference that the deposits are taxable. It may be that they are regularly and periodically made; it may be that they are made at irregular intervals; it may be that they are made from currency removed from safety deposit boxes, but, as long as the taxpayer is conducting a cash business and the deposit books show substantial currency deposits and there is proof of removals from the safety deposit boxes into deposits, the circumstances are proper to be considered in determining whether the deposits represent current taxable receipts, if a thorough investigating analysis of the deposits is made, as was the case here and as is required generally, Buttermore v. United States, 6 Cir., 180 F.2d 853. The question as to what facts and circumstances will justify a proper inference of a deposit of taxable income, becomes a question of fact for the jury under the supervision of the trial court. That such evidence may result from analysis of bank accounts and cancelled checks is entirely permissible. United States v. Bender, 7 Cir., 218 F.2d 869. There having been no evidence of loans or gifts to defendant or inheritance by him, there is no reason why the deposits correlated by the auditor should not have been submitted to the jury.

The Government supplemented its proof under the bank deposit theory, and demonstrated in addition, from its point of view, a deficiency by a computation made upon the net worth theory as shown in exhibit 108. Defendant insists also that there was no proper basis for this computation.

The Government may prove its case, of course, by circumstantial evidence from which the jury may infer justifiable facts. It is not required to prove a negative or to refute all possible speculation as to source of funds. Campodonico v. United States, 9 Cir., 222 F.2d 310, certiorari denied 350 U.S. 831, 76 S.Ct. 65. Consequently, it may employ the net worth method. Obviously, it is not necessary to prove the exact amount of deficiency averred in the indictment. It is sufficient to prove that a substantial amount of tax liability has been willfully averted. Sasser v. United States, 5 Cir., 208 F.2d 535.

Here, the Government started out with defendant's statement that he had nothing to speak of prior to 1945 and no inheritance or gifts in his financial history, as he disclosed it to the Government auditors. Prior returns of the taxpayer are sufficient to establish a firm starting point. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; United States v. Skidmore, 7 Cir., 123 F.2d 604, certiorari denied 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201. The admissions of defendant resulting from his failure to include in his prior tax returns more than was reported constitute evidence that he did not have an income in excess of the amounts for which he was required by law to file a return. Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876; Smith v. United States, 348 U.S. 147, 157–158, 75 S.Ct. 194, 99 L.Ed. 192; Leeby v. United States, 8 Cir., 192 F.2d 331.

There was extended persuasive evidence that defendant had a net worth, on December 31, 1944, of $1,019. Starting on this basis, for the period from 1920 to 1946, the evidence tended to show that his net worth on December 31, 1946 was $79,629.54. Government's exhibit 108 showed a net worth at that time of $79,590.68. Defendant would not say exactly how much property he had at any time. On the bank deposit method the calculation showed net income omitted in 1947 and 1948 of $57,764.40. Calculated on the net worth method, the amount was $58,361.38. In both exhibits defendant was given credit for $24,758 cash on hand on December 31, 1946. Doyle's own figures tended to corroborate these ultimate facts. Furthermore, his voluntary statements and his employment records belied any possibility that the increase in net worth came from any pre-existent wealth.

The amount credited to him for expenditures for living expenses, in order to arrive at a fair basis for calculating how much was left for addition to capital, was arrived at largely from his own statements as to what those costs were. His own testimony was in the record and the basis upon which the living expenses were computed was fully explained to the jury, which made its decision approving the Government's figures.

Under the authorities, the admission of exhibits 103 and 108 was not prejudicial error; the admission of each, following a legitimate theory or method of determining unreported income was within the limitations upon the rule. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. The sources from which the figures were obtained and the calculations prepared were in evidence. The audits were prepared by a certified public accountant from the documentary and oral evidence. Defendant enjoyed ample opportunity to cross-examine the auditor fully as to all of these details and as to the evidentiary sources whence they came. It is significant, we think, that the result was substantially the same, whether the auditor followed the bank deposit method or that of net worth.

Defendant complains that his motion for a bill of particulars prior to trial was improperly denied. Ordinarily, of course, it is safe practice for the court, in the exercise of its discretion, to permit a demand for a bill of particulars. However, a proper bill of particulars does not require inclusion of a statement of the theory of law upon which the Government expects to proceed, United States v. Klein, D.C., 124

F.Supp. 476, but is to be confined to facts relied upon, and supplied only where there is no opportunity afforded for the defendant to prepare to meet the charges of the indictment without further information as to such particulars. The allowance or denial of the motion is largely a matter of discretion and denial will not be treated as prejudicial error or abuse of discretion where there is no proof of prejudice.

■ From the evidence here, it is apparent that Doyle, in his continued conversations with the auditors and with the agents of the Government, prior to his indictment, had been fully advised as to what the Government was contending as to his unreported income. The records, such as they were, were in his possession and control and he must have known that the Government was relying upon those records and his bank accounts, as indeed it did. Furthermore, during the course of the trial, lasting from January 11 to January 29, there was not the slightest suggestion by counsel for defendant at any time that any of the proofs submitted by the Government resulted in surprise to the defendant or in prejudice to his right to a fair trial. When the auditors identified the exhibits, there was no surprise expressed as to exhibits 103 and 108, and no application made for adjournment, recess or continuance, no claim that defendant needed more time in order to check and digest the details of the exhibits. In other words, whatever the desirability of the allowance of the motion originally, the proof indicates not the slightest surprise, not the slightest prejudice. Consequently, we cannot say there was error in denial of the motion.

■ Defendant asserts error upon the part of the trial court in giving and refusing instructions. Upon examination of the record we find that defendant's offered instructions which were not given were fully covered by the court in instructions which it gave. Of course, it is not necessary to charge upon any subject in the exact words of an offered instruction which is denied, when it appears from the charge as a whole that the subject matter has been fully covered. The words "character" and "reputation" seem to have been indiscriminately used by the parties and by the court at various times, but from the consideration of the charge as a whole, we believe it was made clear to the jury that what was in issue was defendant's reputation rather than his character. Defendant's cited authority differs from this case as it did from United States v. Echeles, 7 Cir., 222 F.2d 144, 160, certiorari denied 350 U.S. 828, 76 S.Ct. 58, where we said: "The instructions given in the two cases are not the same; they are significantly different. Here, the jury was told, in substance, that if, after they considered all of the evidence, including evidence of good character or good reputation, they believed beyond a reasonable doubt that the defendants were guilty, then they should not use good reputation as an excuse to acquit the defendants. In the Semeniuk case [United States v. Semeniuk, 7 Cir., 193 F.2d 508], the jury was told that the mere fact that a defendant may have had a good reputation prior to the time of the trial should not be used by the jury as an excuse to acquit him."

■ Certain other instructions were attacked as to which no objection was made in the trial court. In certain other instances defendant's counsel said they had no objection. Obviously, no question is presented for review where there are no objections to instructions, unless the court is convinced that prejudicial error has occurred. United States v. DeMarie, 7 Cir., 226 F.2d 783, certiorari denied 350 U.S. 966, 76 S.Ct. 436. Notwithstanding this governing rule, we have examined all of the objections with reference to instructions now raised, whether objections were preserved in the trial court or not, and, without unduly extending this opinion, are content to dispose of defendant's arguments with the statement that the charge as a whole explained everything fairly and impartially and in a manner

which made it impossible for the jury to misinterpret its content. We think defendant's contentions in this respect are without merit.

■ Defendant further complains of the Government's argument to the jury. But again the record discloses that no objection was made to the argument and in our opinion there is nothing therein of prejudicial character. As we said in Malone v. United States, 7 Cir., 94 F.2d 281, at page 288, certiorari denied 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529: "* * * the argument, taken as a whole, though vigorous and forcible, is as fair to the defendant as might reasonably be expected under the circumstances. Counsel have a right to make any argument based upon evidence proven in the case, or which may be reasonably inferred therefrom, and to make reply to that made by opposing counsel, and, in doing so, statements may be made which otherwise would be improper. Defendant's trial counsel evidently did not regard the argument as vicious or unfair as objection was made to one statement only, and that of minor importance."

Further complaint is made concerning certain rulings on the admission and exclusion of testimony. We find nothing of a prejudicial nature therein.

■ We have made an extended examination of the record. We have not included many of the voluminous details appearing therein, but we find therein competent pertinent evidence in support of the indictment charge which the jury had a right to believe, and which it obviously believed was sufficient to sustain the verdict.

The judgment is

Affirmed.

FINNEGAN, Circuit Judge (concurring).

I join in the Court's opinion and agree that the judgment appealed should be affirmed. There is absent in this record any abuse of discretion on the trial judge's part in refusing the requested particulars, as Judge Lindley's opinion makes plain. Reviewing denials of motions for a bill of particulars necessitates an examination of the facts and circumstances surrounding each case. Defense requests for particulars, under Rule 7 (f), Federal Rules of Criminal Procedure, 18 U.S.C. (1952 ed.), are now apparently geared to the increasing pace of net worth and bank deposit methods of prosecuting criminal cases involving alleged violation of the internal revenue laws. My separate statement arises from a frank recognition of the peculiar problems confronting counsel and client defending against cases erected on either one or both of those theories. When he delivered the Court's opinion in Holland v. United States, 1954, 348 U.S. 121, 129, 75 S.Ct. 127, 132, 99 L.Ed. 150, Mr. Justice Clark cautioned that: "Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute."

Averting surprise to the defense, in criminal cases, is a chief aim of a bill of particulars by furnishing the defendant with particulars he is enabled to prepare his defense and meet the accusations embodied in the indictment under which he is tried. It is for this reason that the prosecution is delimited to the perimeter staked out by the particulars supplied in response to an order allowing the defense motion. United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 309.

Attached to Doyle's motion for a bill of particulars is an affidavit of his certified public accountant stating that he "* * * examined the books and records of the defendant John J. Doyle for the years 1947 and 1948; and the income disclosed by said books and records is in agreement with said defendant's copies of his income tax returns as filed for said years." Another passage from the Holland case, 348 U.S. 121, 131–132, 75 S.Ct. at page 133, has significance here:

"The net worth, technique as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. Petitioners' accounting system was appropriate for their business purposes; and, admittedly the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage."

Insisting that his books and records coincide with the tax returns filed, and on which the indictment is based, Doyle asked that the government supply him with "the method by which 'joint net income'" was determined; the amounts and items of income, deductions, and credits, and for "the method used in reconstructing" income for the calendar years involved. Yet the indictment charged Doyle with an offense described in statutory language. The short of it is that Doyle bottoms his assertion of discretion abused on the district judge's refusal to order a revelation of the *"theory"* of prosecution. There is a difference between specifying the charge made against an accused person and the theory which is pursued by the government in establishing its case at a trial on the merits. From this record it appears that Doyle was in possession of the means of ascertaining the various items of income and deduction that he wanted the government to disclose. United States v. Skidmore, 7 Cir., 1941, 123 F.2d 604, 607. My remarks and concurrence are expressly limited to this appeal, for the problem of a bill of particulars is a sensitive area in federal criminal prosecutions of the type involved here, and I would prefer to leave latitude available for future reviews of district judges' discretion.